J-M06001-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Petitioner | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| MUHYYEE-UD-DIN ABDUL-RAHMAN | : | No. 222 EDM 2025 |

Appeal from the Order Entered September 29, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0006587-2024

BEFORE: LAZARUS, P.J., BENDER, P.J.E., and KING, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED NOVEMBER 14, 2025**

Petitioner, the Commonwealth of Pennsylvania, filed a "Petition for Specialized Review"[1] (Petition) seeking review of the September, 29, 2025 order of the Court of Common Pleas of Philadelphia County, which granted Defendant Muhyyee-Ud-Din Abdul-Rahman's petition to modify bail pending sentencing,[2] reducing his bail to sign on bond, and placing him on "Strict

---

[1] **See** Pa.R.A.P. 1610 (providing for review of order granting or denying release or modifying conditions of release before sentence via petition for specialized review). **See also In the Interest of N.E.M.**, 311 A.3d 1088, 1101 (Pa. 2024) (holding Superior Court "lacks the discretion to decide whether to grant or deny [] petitions for specialized review" and, therefore, review of merits of such petitions is mandatory).

[2] **See** Pa.R.A.P. 1762(b)(2) (providing order relating to bail when no appeal pending shall be subject to review pursuant to Chapter 16 of Rules of Appellate Procedure).

Conditions of House Arrest on Electronic Monitoring."[3]  Upon careful review, we reverse the trial court's order modifying bail pending sentence and reinstate Defendant's original bail.[4]

The record in the instant matter reflects that Defendant, who was 16 years old at the time, was arrested on August 11, 2023, and charged with multiple offenses, including attempting to build weapons of mass destruction that he planned to use to bomb the Philadelphia Pride Parade, before fleeing the country to join a terrorist organization in Syria.  Specifically, as the Commonwealth recites in its Petition, the evidence established that Defendant:  "(1) attempted to manufacture "TATP" (a potent explosive known as "The Mother of Satan") using a recipe he found online; (2) practiced bomb-ignition using 12 to 20 ignition devices; (3) conducted a series of online

---

[3] Upon the filing of the Commonwealth's petition, this Court directed the trial court to file its Pa.R.A.P. 1762(e) statement on or before November 4, 2025, and for the Defendant to file a response within five days of the trial court's statement.  *See* Pa.R.A.P. 1762(e) ("Upon receipt of a copy of an application for relief under paragraph (a) or a petition for specialized review under paragraph (b) that does not include an explanation for the bail determination, the judge who made the bail determination being reviewed shall forthwith file of record a brief statement of the reasons for the determination or where in the record such reasons may be found.").  This Court received the trial court's statement of reasons on October 29, 2025, and the Defendant's response on November 3, 2025.  The trial court's Rule 1762(e) statement (Trial Court Opinion) directs this Court to "pages 113-123 of the [bail] hearing transcript dated September 29, 2025."  *See* Trial Court Opinion, 10/27/25, at 1.

[4] The Commonwealth acknowledges in its current Petition, it "seeks only to reverse the lower court's modification of bail pending sentence." Commonwealth's Petition for Specialized Review, 10/20/25, at 13-14.

searches, including what the punishment was for homosexuality under Sharia law, what the route was for the Philly Pride Parade, where to find trash cans along that route, and how to build pressure cooker bombs (i.e., the same device used in the Boston Marathon bombing); and (4) communicated online with two state-designated terrorist groups (KTJ and HTS) in Syria, where he planned to flee[,] . . . all while living at his family's house and without their knowledge." Commonwealth's Specialized Petition for Review, 10/20/25, at 3.

On August 12, 2023, Defendant additionally was charged with criminal conspiracy,[5] attempting to build weapons of mass destruction,[6] arson,[7] causing/risking catastrophe,[8] criminal mischief,[9] possession of an instrument of crime,[10] and recklessly endangering another person[11] (REAP).[12] In

_____

[5] 18 Pa.C.S.A. § 903.

[6] *Id.* at § 2716.

[7] *Id.* at § 3301.

[8] *Id.* at § 3302.

[9] *Id.* at § 3304.

[10] *Id.* at § 907.

[11] *Id.* at § 2705.

[12] On October 23, 2024, Defendant filed a pretrial motion for modification of bail that was denied, following a hearing, on January 3, 2025.

September 2024, the trial court set monetary bail at $5,000,000.00 (at 10%), which remained through trial.

Following a jury trial, on September 17, 2025, Defendant was found guilty of attempting to build weapons of mass destruction (F-2), possessing explosive materials (F-3), risking a catastrophe (F-3), and REAP (M-2). After the jury rendered its guilty verdicts, the Commonwealth filed a motion to revoke Defendant's bail or, in the alternative, maintain bail at $5,000,000.00, and the Defendant filed a motion to modify bail to house arrest.

At the September 29, 2025 bail hearing, the Commonwealth presented four witnesses, Tyrell Brown, ASA Khalfi, Special FBI Agent David Cunningham, and Jeffrey Lewin. Defendant presented no witnesses, although defense counsel submitted previously-filed letters of support for Defendant.

At the hearing, Brown, the founder of Philadelphia's Gay Pride Parade (Parade) and an employee of an organization dedicated to social services and social justice for the LGBTQ community, testified that the Parade is the largest public event in Philadelphia, with 145,000 people in attendance this year (2025). *See* N.T. Bail Hearing, 9/29/25, at 8, 9. He explained that shortly before the Parade festivities in 2023, he was notified by the FBI that an individual living in West Philadelphia was planning to build a bomb to threaten the festival, and the FBI showed him numerous internet searches detailing the specific nature of the threat. *Id.* at 9-10, 21. Due to the threat, Brown explained that the organizers of the Parade took on $16,000.00 of additional costs to hire more security, and their insurance premium ballooned from

$6,500.00 to $47,000.00, "because they were worried about mass casualty events." *Id.* at 10-11, 18. According to Brown, these added difficulties and costs associated with the security concerns led Old City and Midtown to cancel their respective festivals. *Id.* at 13. Further, Brown advised his family and friends not to attend the Parade in 2024, due to the threats. *Id.* at 11. Brown explained that the "community is just there to enjoy themselves," and these security issues have created more labor and more anxiety and "stresses [him] out beyond belief." *Id.* at 14.

Commonwealth witness Khalif, a local activist and organizer within the Philadelphia LGBTQ community, testified that he is involved in bringing in new recruits from out of town to enjoy the Parade. *Id.* at 24-25. Khalif testified that he and the LGBTQ community learned in 2023 that someone posed a threat toward the upcoming Parade, which was later confirmed by the media. *Id.* at 30. Khalif testified that if Defendant were to be released, "the anxiety would definitely go up again," explaining:

> The threat is real. We've seen threats. I have lost so many friends through violence in this community. So many funerals that I've gone to because threats were real, and I just can't risk it, and I won't risk, and I won't allow my family members and friends. And I can't promote something in good faith, if I know that there's a threat out there towards our community, and It's Pride. I can't.

*Id.* at 27-28. Khalif stated that if Defendant were released, he would advise his family members, as well as allies and vendors, not to attend events in the foreseeable future, out of concern for their safety. *Id.* at 27. On cross-examination, defense counsel asked Khalif if he knew Defendant issued an

- 5 -

apology and whether it would mean anything if he had. *Id.* at 30-31. Khalif denied hearing that Defendant apologized, but stated that if "the apology was sincere, I would definitely take it into consideration." *Id.* at 31.

The Commonwealth then admitted recordings of phone calls made by the Defendant while he was in prison. *Id.* at 32-37. The Commonwealth told the court that in reviewing all of the calls, they found "no information or evidence of efforts to glean any treatment, speak to anyone to deprogram or deradicalize." *Id.* at 36. The trial court then asked if there was any evidence on the calls of any further attempts by Defendant to plan or make threats, to which the Commonwealth indicated there was not, but emphasized that Defendant, like all those incarcerated, was notified he was being recorded at the outset of the calls. *Id.* at 36-37.

Next, the Commonwealth offered the testimony of FBI Special Agent Cunningham who was assigned to the investigation in this matter. *Id.* at 37, 40. He testified that he was part of the FBI Philadelphia Joint Target Task Force, which became involved in the case at "the point where the risk to the public was too significant to let it play out." *Id.* at 49. He explained that during the investigation, he learned of Defendant's WhatsApp messages and became concerned about certain communications between Defendant and his mother and father. *Id.* at 49-50. The Commonwealth moved for the admission of WhatsApp messages between Defendant and his father as Commonwealth's Exhibit No. 2 and messages between Defendant and his mother as Commonwealth's Exhibit No. 3, on the basis that the messages

were relevant because Defendant requested to be released on house arrest, and his parents would be very integral and involved in that process. *Id.* at 52-53.

After they were properly admitted, the Commonwealth questioned Agent Cunningham about the WhatsApp messages contained in Commonwealth's Exhibits 2 and 3. Agent Cunningham testified that around the end of July 2023 and August 2023, Defendant sent his father a series of ISIS products, a PDF of the moral doctrine of Jihad, and a list of other memes, PDFs, and videos of ISIS. *Id.* at 54, 62-63. Defendant's father responded to his son with a series of photographs of his firearm collection and then states, "You think this is a joke?" *Id.* at 63. According to Agent Cunningham, Defendant's profile picture on WhatsApp at that time was a photograph of Osama bin Laden, and after his father messaged him to "[t]ake that picture down . . . we don't want to subscribe to nothing he is upon," Defendant responded, "I'm taking it down[,] but what did he do wrong? He wasn't responsible for 9/11 and he was killed [] because he spoke the truth . . . and fought against injustice." *Id.* Defendant's father replied, "Incorrect. He raised arms against Muslim rulers. Learn your religion. Take it down. I don't give a damn what you think he was about," to which the Defendant responded with an image of the flag of the Taliban, then with the flag of ISIS, and then with more Jihad videos. *Id.* at 63-64. Eventually, after further discussion on the subject, Defendant's father told him to "[s]top searching, you're making our IP address hot." *Id.* Agent Cunningham then went through several

WhatsApp messages sent by Defendant to his mother around the same time, which also contained ISIS and Jihad-related content. *Id.* at 64-65.

Agent Cunningham also testified to surveillance conducted on Defendant during the investigation, explaining that 16- or 24-hour surveillance is not typical in the FBI and requires that it be "a significant threat." *Id.* at 55-56. Agent Cunningham confirmed that such determination was made in this case because they believed there to be an active, dangerous threat. *Id.* at 56. In addition, Agent Cunningham testified about the process of deradicalization:

> So[,] through our work—so, I primarily investigate what we call homegrown extremist. A significant aspect to that is individual[s] who are radicalized. So[,] we look at ways to de[]radicalize individuals. De[]radicalization is a two-step process.
>
> **The first step you need is disengagement. So, typically, that though looks like incarceration. The second point is deliberate voluntary de-radicalization. And that could occur through multiple-different mechanisms: Therapy, et cetera, Parents for Peace, but it has to be voluntary.**
>
> *    *    *
>
> Disengagement and de[]radicalization are coupled together. **You can't just disengage someone and expect de[]radicalization to happen. And then you can't expect de[]radicalization to happen without disengaging from the source of that violent extremism.**

N.T. Bail Hearing, 9/29/25, at 60 (emphasis added). When asked by defense counsel whether Defendant could effectively deradicalize outside of prison in this case, Agent Cunningham responded, "Based off the severity of this threat, I would not agree with that." *Id.* at 75-76. Agent Cunningham also acknowledged that he has not seen "[t]he threat from two years ago []

mitigated." ***Id.*** at 76. Later in cross-examination, Agent Cunningham admitted that deradicalization "theoretically could happen outside of incarceration facilities." ***Id.*** at 77.

Agent Cunningham testified that he reviewed all of Defendant's 648 phone calls and 146 video calls during his pretrial incarceration and that none of them included any indications that Defendant had seen a therapist or had undergone any deprogramming or deradicalization therapy. ***Id.*** at 38-39. Agent Cunningham also indicated that he had not seen any information [that would indicate] the dangerousness of Defendant [was] any different[] today than in August of 2023. ***Id.*** at 51. However, Agent Cunningham acknowledged on cross-examination that talking to a counselor or praying to a God to seek guidance could be helpful towards deradicalization and confirmed that he does not know whether Defendant had done that while incarcerated. ***Id.*** at 70. Agent Cunningham also admitted that he had no information to indicate that Defendant actively threatened anyone since his arrest in August of 2023. ***Id.*** at 77.

Lastly, Jeff Lewin, the Pretrial Services Supervisor of the Electronic Monitoring Center, testified for the Commonwealth. ***Id.*** at 78. Lewin explained that his staff consists of a "bunch of part-time employees" and stated: "all we do is, we monitor an electronic board for everybody on house arrest in Philadelphia pretrial and probation. If their box alerts, all we do is send a notification through e-mail to their officer to please follow up with their client." ***Id.*** at 79-80. **Lewin stated that his center does not have GPS**

**to monitor individuals on house arrest** but, instead, utilizes radio-frequency-based equipment. *Id.* at 80. Importantly, when asked whether there would be a way for his office to prevent Defendant from having access to a cell phone on house arrest, due to the nature of this case, Lewin responded, "No. We can't tell anybody not to have a cell phone." *Id.* Lewin also testified that, as civilians, his staff does not go to the subject's house "for anything." *Id.* He further explained, "Well, we monitor their box and their bracelet, we don't supervise them. We just send notifications to their supervised officer." *Id.* at 82. Lewin also testified about the process when a violation occurs, including all of the steps and different individuals that are involved, and confirmed that the process could take hours before a violation is reported to a house arrest officer. *Id.* at 88.

Although Defendant did not present any witnesses at the bail hearing, defense counsel directed the trial court to its previously-submitted filings that included letters of support for Defendant. *Id.* at 91. In his closing argument, Defense counsel noted that at the time of the hearing, Defendant had already been in custody for 25 months and, therefore, "even on the aggravated side,[13] he's done his time already." *Id.* at 94. The defense also argued that during his pre-trial incarceration, Defendant was "being detached [and] rehabilitated." *Id.* at 93. Finally, defense counsel pointed out that Defendant,

---

[13] The guideline range for Defendant's convictions is 6-14 months, +/- 6 months.

who was still only 19 years old at the time of the bail hearing, was only 16 or 17 at the time of the incident, but he was treated as an adult and did not get the benefit of the juvenile system. *Id.* at 94.

During its closing argument, the Commonwealth pointed out that the only change of circumstances since the court's prior bail determination is that the Defendant's presumption of innocence is now lost post-verdict, having been convicted by a jury. *Id.* at 101-02. The Commonwealth also assured the court that treatment could have been arranged in the prison, but highlighted the absence of any effort to receive such treatment before now. *Id.* at 102. In addition, the Commonwealth emphasized that the sentencing guidelines are just that, guidelines, and that history and character of the defendant, safety of the community, and likelihood of future conduct are important sentencing concerns. *Id.* at 103.

At the conclusion of the hearing, the trial judge, the Honorable Michele D. Hangley, entered an order granting Defendant's motion for modification of bail, modifying bail from "$5,000,000.00 Monetary at 10% to $5,000,000.00 Sign Own Bond with Strict Conditions of House Arrest on Electronic Monitoring." Order, 9/29/25, at 1. The modified bail order also set the following bail conditions: Defendant may not live at his former residence[]; Defendant must live in a residence with no access to Wi[F]i and no Internet access; Defendant may not have telephonic access or web access, including communication platforms; Defendant is to have NO communication with designated terrorist groups; Defendant will have NO communication devices;

Defendant's passport will be confiscated; Defendant may not communicate with anyone in any language other than English; Defendant cannot leave the house except for verified appointments with his lawyers; the house where Defendant will reside must be inspected weekly for any restricted materials; and Defendant cannot possess any firearms or replica firearms and there can be no firearms or bomb-making materials in the home. ***See id.*** Sentencing was deferred until November 25, 2025.

The trial judge explained her reasons for modifying Defendant's bail, on the record, as follows:

> So[,] I have considered everything: I considered the testimony that I heard during the arguments today. The testimony today. The lengthy submissions that both, Commonwealth and the defense put before me. I read all of that, considered all of that. I'm now going to give the findings of fact and a ruling. I believe that in light of the seriousness of this case I should do that and explain where I'm coming from, but first I want to tell you what we're here for, and make sure that everyone understand that this is not a sentencing.
>
> Nothing I say today should be taken as a ruling on what my sentence will be. The only question for now is whether [D]efendant can be released from custody, in the time between now and when I impose the sentence. And at that point, at the time of sentencing, if I require that, he will be taken back into custody.
>
> The question I need to address right now [] is whether [Defendant] poses a flight risk, or is a danger to the community. And whether I should reduce his bail or revoke it. And I will list the factors that go[] in either direction, on this consideration.
>
> The factors that are in favor of finding he is a danger to the community or a flight risk [are as follows]. It is indisputable that he did something. He did something extremely dangerous to himself and to others. He could have seriously, seriously,

seriously, hurt himself or his family.  Hurt his neighbors and hurt others by trying to build bombs.

This is a very serious offense.  It is very fortunate that the FBI identified that risk and stopped it from happening. He was luck and so was  - - he was lucky and so was his family.  We can't forget about that fact.

We also can't forget about the fact that his social media showed that he had views that our community finds abhorrent. And also an appetite for violent nature.  Those are also facts that, some of those things were going through his mind, at the time.[14]

* * *

There was some deception involved in this, however, I do have to acknowledge that [Defendant] did come clean when he was arrested.  He gave a long statement.  Handed over his phone and handed over his electronics.  And that his efforts to cover his tracks before he was arrested, were not very effective or very well planned.  He was not – either he didn't have the ability or didn't have the motivation to make sure that nobody knew what was going on.

The factors that suggest he's not a flight risk:  [h]is cooperation, his character evidence.  And that was extensive.  I [have] never seen this level of letters of support, of people in the courtroom, eloquent, full of very detailed – and several of them from people who have no reason to support him[—t]eachers, staff members from juvenile custody.  And those were quite persuasive.

The resources that the defense team has brought to bear on figuring out a plan for him[.]  Coming up with resources, doing a report, lining up people who may be able to help him, if and when he's released.

I certainly have concerns about [Defendant's] parents, in that they apparently were blind or not sufficiently attentive to what was going on with him.  That happens with parents sometimes, but he does have relatives and family who are supportive.  Who are willing to put effort in and who, undisputedly, are not aligned

_____

[14] The trial judge also acknowledged that she would not hold it against Defendant for exercising his right to go to trial.  *See id.* at 116.

- 13 -

with the kind of radical position or radical views that he was e[s]pou[sing], at the time.

He had no infractions in juvenile custody. He was a model prisoner. He has no infractions in adult custody. He's been in solitary confinement for a year.[15] That shows – and he may not have been able to comply with the rules and restrictions, at some point, but he has shown that he is recently, that he's able to comply.

He has no criminal record. No history of violence. He has limitations. One relative described it in here. He has an IEP. He was diagnosed with ADHD, he does struggle in school, and he is a rather naïve person, in terms of getting around in the wor[l]d. That's just not a great capacity, to put things into effect.

The 800 prison calls. . . . I found them actually, to be a positive factor for two reasons: [o]ne is that what [Defendant] said on those calls, I don't believe [] shows either a lack of regret or any kind of bad motive. I mean, he said he didn't want to confess to anything, that's reasonable. He didn't – he was joking about statement of responsibility. He said he used, I think his big boy words or his big grown-up school words. That seemed like a fair description to me, and it shows [a] little bit of humor, which is relevant to his danger in the community.

Another factor is, the fact that house arrest is an option, and it could be very strict house arrest. House arrest can have a lot of conditions.

Mr. Lewin's testimony was credible and relevant, but he is in charge of whether someone leaves, have a track when they leave. He was not the person to testify to what conditions you can impose when someone's [on] house arrest, or what kind of monitoring there is.[16]

_____

[15] This Court is unable to ascertain from the record on appeal why Defendant was placed in solitary confinement.

[16] While the trial judge points out that Lewin, in his capacity as supervisor at the center, is not involved in devising conditions for house arrest or responsible for monitoring and imposing those conditions, the court's rationale misses the mark. Instantly, there was **no** evidence presented at the hearing

*(Footnote Continued Next Page)*

I do believe that [D]efendant is unlikely to abscond, given the capacity and also given the fact that he will very much know that any steps off the path between now and sentencing [] could be catastrophic for him. . . . So[,] I don't – I could be wrong, but I do not believe [Defendant] is a flight risk, at this point.

I take into account that he was a juvenile when this happened, and that juveniles change. And they do make stupid decisions and do stupid things.

**I took into account that there are indications of mental health issues. The mental health evaluation found some indications of that. I would like to know more about that.**

**Certainly, looking at [D]efendant's computer searches, 15 hours a day on searches, one after another on things like[—f]ind jobs in Minnesota, and where to buy a trailer. And random images of lions and some innocuous, some very concerning. I would like to hear more about [Defendant's] mental health.**

[] The evidence from his year in juvenile custody, I believe can be an indication from what I understand about de[]radicalization, based on the information that the Commonwealth has given me[, d]e[]radicalization doesn't have to [take place] in [] formal counseling. It can be contact with other people in the community. And one of the staff members pointed out that it would be impossible for [Defendant] to hide radical beliefs, given the length of time that he was there, and consistent communication, and all [of the] studying and other things that he did.

I notice myself, that according to the factors, that [Defendant] has a lot of mitigating factors. Factors that include[] family, social support, being on the radar with law enforcement, having a sense of humor, and that he doesn't appear to have a lot of these concerns.

**And so where I come out on that is, I do believe we need more information. I cannot accept the Commonwealth's position that he has been diagnosed or rules to be a person that poses a future threat. We just haven't—and no one—**

---

that assured the "strict" electronic monitoring conditions imposed by the trial court for Defendant's house arrest could be practically carried out "to ensure the protection of any person or the community." **Talley**, **supra** at 525.

- 15 -

**we didn't hear from anyone with expertise in this. I don't believe that anyone with expertise has evaluated him, at least in the last two years.**[17]

So that framework doesn't go into my decision today, except to say that I just don't think it has been proven, that he is a danger, based on everything I heard.

There are some concerns about where we go now. Commonwealth is asking me, basically, to treat this like a domestic terrorist case, when he hasn't been charged or proven, and the jurors didn't make any findings on that.

The Commonwealth is asking me to make a determination, an expert determination, when no expert has presented evidence. And the Commonwealth is asking me to put it on him to show that he's been de-radicalized, when he's been in a position for the last two or three years where he's legally and physically unable to make that showing. So, I do -- it has a bit of a minority or flavor about it that it would be up to him to show -- or that I should keep him in custody, pending sentencing, based on a guess as to what might be in his mind.

So[,] I do believe that—I'm glad that we all agree that more assessments are necessary. We could come to a very different conclusion based on what[] those assessments show.

I do believe that in the interest of fairness in getting the proper assessments, that [Defendant] not be[] in custody when this takes place. So that is another factor going into this. I want it to be done right, and I want everyone to get the opportunity to prove what needs to be proved. So that is a reason to not keep him in custody. Based on everything that I said . . . I believe that we

_____

[17] By stating that the court "cannot accept the Commonwealth's position" and that it needs more information regarding whether Defendant poses a future threat, the trial judge appears to be imposing the burden of proof on the Commonwealth, rather than Defendant who is the party seeking bail modification. **Cf. Talley**, **supra** at 513 (when Commonwealth seeks to deny bail, Commonwealth bears both burden of production and persuasion). While we acknowledge that the court had competing motions to revoke and modify bail before it, when it ruled on Defendant's motion to modify, it was the **petitioner's** burden to prove that he has been deradicalized and is no longer "a danger to any other person or to the community or to himself[.]" Pa.R.Crim.P. 521(D)(2).

can safeguard him adequately, by putting him on house arrest, pending sentencing. So[,] I'm denying [the] Commonwealth's motion to revoke bail. I'm reducing his bail to sign on bond. House arrest with all [the] condition[s] that I stated last time we were here.

I need the family, the people who have spoken up for him, to live up to their commitments. To make sure that he has no internet access. That he doesn't leave the house. That he doesn't have access to anything dangerous. That includes firearms[.]

N.T. Bail Hearing, 9/29/25, at 113-124 (emphasis added).

Following the court's decision to modify Defendant's bail, the Commonwealth immediately moved for reconsideration and for a stay, both of which the trial court denied on the record. *Id.* at 131. The Commonwealth then moved to reconsider the denial of the stay, which the trial court also denied. *Id.*[18]

On October 20, 2025, the Commonwealth filed the instant Petition under Pa.R.A.P. 1610, claiming:

The trial court abused its discretion in granting [Defendant's] motion to modify bail pending sentence and releasing him on house arrest [where] . . . [D]efendant explicitly declined to present any evidence of any change in circumstances from his pre-trial posture of his motion to modify his bail to house arrest pending sentence [and where c]onversely, the Commonwealth presented overwhelming evidence that [D]efendant's release from custody would have a detrimental effect on the community he victimized [where] he is no less a danger to the community now than he was [before] trial[, where ] he has a callous attitude about the gravity of his actions, and [where] enforcing the conditions of house arrest [] would be impossible.

---

[18] On October 20, 2025, this Court granted the Commonwealth's emergency application to stay the bail order pending sentencing. *See* 208 EMD 2025.

Specialized Petition for Review, 10/20/25, at 12, 14. The Defendant filed a response to the Commonwealth's petition on November 3, 3025. In his response, Defendant noted that the trial court considered all the proper factors in coming to its decision to modify bail, including his age, family and community support, lack or prior criminal history, good behavior while in custody, and expression of remorse. *See* Defendant's Answer to Petition, 11/3/25, at 3-4 (unpaginated). Moreover, Defendant contended that he has already served the equivalent of an aggravated portion of a sentence while awaiting sentencing, that continued incarceration places "significant[] undue burdens" on him and his family, and that he will require extensive pre-sentence medical evaluations and therapy that will best be conducted while he is not in custody. *Id.* at 4, 6 (unpaginated). Finally, Defendant claimed that the Commonwealth's evidence "requires too much speculation, 'uncertainty,' and also require[s] 'excessive inferential leaps' of future 'possible' behavior of [D]efendant." *Id.* at 6 (unpaginated).

At the outset, we observe that, in light of our Supreme Court's decision in *N.E.M.*, 311 A.3d at 1101, wherein the Court held that this Court "lacks discretion to decide whether to grant or deny these petitions for specialized review," a review of the merits of the instant Petition is now mandatory. *Id.* at 1101. Although *N.E.M.* addressed Pa.R.A.P. 1612 petitions for specialized review relating to juvenile out-of-home placement, its rationale is equally applicable to Rule 1610 petitions for specialized review of bail. There, the Court explained that, unlike Chapter 13 of our Rules of Appellate Procedure

- 18 -

which governs interlocutory appeals by permission, Chapter 16 evidences a "mandatory nature" for petitions for specialized review and provides a "procedure for appellate review of certain discrete issues." *Id.* at 1099 (citation omitted). The Court further explained that Rule 1601 "controls how appellate review will be afforded, not how a party can seek permission to appeal." *Id.* Thus, we turn to the merits of the instant Petition.

Generally, this Court reviews bail decisions for an abuse of discretion and will reverse the trial court only if we conclude its determination "misapplies the law, or its judgment is manifestly unreasonable, or the evidence of record shows that its decision is a result of partiality, prejudice, bias, or ill will. *See Commonwealth v. Miller*, 319 A.3d 575, 580 (Pa. Super. 2024) (citation omitted). Moreover, this Court's scope of review is limited to the record evidence adduced at the bail hearing, along with the findings of the trial court, viewed in the light most favorable to Defendant as the prevailing party. *Id.* (citation omitted). This Court will affirm the trial court's bail decision "if [the court's] factual findings are supported by competent evidence of record, and [its] legal conclusions drawn therefrom are correct." *Commonwealth v. Talley*, 265 A.3d 485, 527 (Pa. 2021).

The right to bail, with certain exceptions, is enshrined in Article I, Section 14 of the Pennsylvania Constitution, which provides in pertinent part:[19]

> All prisoners shall be bailable by sufficient sureties, unless for capital offenses or for offenses for which the maximum sentence is life imprisonment or unless no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the proof is evident or presumption great[.]

PA. CONST. art. I, § 14.  However, following a verdict of guilt, a defendant has no state or federal constitutional right to bail.  ***See Commonwealth v. McDermott***, 547 A.3d 1236, 1242 (Pa. Super. 1988) (citation omitted).

Rule 521 of the Pennsylvania Rules of Criminal Procedure provides that:

(D) Modification of Bail Order After Verdict or After Sentencing

> (1) When a defendant is eligible for release on bail after verdict or after sentencing pursuant to this rule, the existing bail order may be modified by a judge of the court of common pleas, upon the judge's own motion or upon motion of counsel for either party with notice to opposing counsel, in open court on the record when all parties are present.

> (2) The decision whether to change the type of release on bail or what conditions of release to impose shall be based on the judge's evaluation of the information about the defendant as it relates to the release criteria

---

[19] The fundamental purpose of bail is to ensure the accused's presence at trial. ***Talley***, 265 A.3d at 515 n.18; ***see*** Pa.R.Crim.P. 103 (defining bail as "the security or other guarantee required and given for the release of a person, conditioned upon a written undertaking, in the form of a bail bond, that the person will appear when required and comply with all conditions set forth in the bail bond").

> set forth in Rule 523. **The judge shall also consider whether there is an increased likelihood of the defendant's fleeing the jurisdiction or whether the defendant is a danger to any other person or to the community or to himself or herself.**
>
> (3) The judge may change the type of release on bail, impose additional nonmonetary conditions as provided in Rule 527, or, if appropriate, impose or increase a monetary condition as provided in Rule 528.

Pa.R.Crim.P. 521(D) (emphasis added).

In **Talley**, our Supreme Court conducted a thorough analysis of a defendant's right to bail pursuant to Article I, Section 14 of the Pennsylvania Constitution. The Court concluded:

> [A] trial court may deny bail under Article I Section 14 when the Commonwealth's proffered evidence makes it substantially more likely than not that the accused: (1) committed a capital offense, (2) committed an offense that carries a maximum sentence of life imprisonment, or (3) **presents a danger to any person and the community, which cannot be abated using any available bail conditions.** That determination requires a qualitative assessment of the Commonwealth's case.

**Talley**, 265 A.3d at 525-26 (emphasis added). The Court provided a non-exhaustive list of factors a trial court should consider in denying bail, which include: (1) the defendant's character; (2) relevant behavioral history or past patterns of conduct; (3) the gravity of the charged offense; (4) the conditions of bail reasonably available to the court; and (5) any evidence that tends to show that those conditions would be inadequate to ensure the protection of

any person or the community.[20]  *Id.* at 525.  Thus, according to the Court, "[i]f the balance of the evidence is rife with uncertainty, legally is incompetent, requires excessive inferential leaps, or lacks any indicia of credibility, it simply is not evident proof, nor can it give rise to a great presumption, that the accused is not entitled to bail."  *Id.* at 526.

With the foregoing standard in mind,[21] we address the Commonwealth's claim that "Defendant's release from custody would have a detrimental effect on the community he victimized, that he is no less a danger to the community now than when he was in pre-trial posture, that he has a callous attitude about the gravity of his actions, and that enforcing the conditions of house arrest would be impossible."  Commonwealth's Petition for Specialized Review, 9/20/25, at 4, 14.  Additionally, we view the record evidence, along with the

_____

[20] These factors either largely mirror or overlap with factors set forth in Pa.R.Crim.P. 523(A), relating to release criteria. The Rule 523(A) factors include: (1) the nature of the offense charged and any mitigating or aggravating factors that may bear upon the likelihood of conviction and possible penalty; (2) the defendant's employment status and history, and financial condition; (3) the nature of the defendant's family relationships; (4) the length and nature of the defendant's residence in the community, and any past residences; (5) the defendant's age, character, reputation, mental condition, and whether addicted to alcohol or drugs; (6) if the defendant has previously been released on bail, whether he or she appeared as required and complied with the conditions of the bail bond; (7) whether the defendant has any record of flight to avoid arrest or prosecution, or of escape or attempted escape; (8) the defendant's prior criminal record; (9) any use of false identification; and (10) any other factors relevant to whether the defendant will appear as required and comply with the conditions of the bail bond.

[21] The procedural posture of this case differs from *Talley* in that in *Talley* the defendant sought release on nominal bail **prior** to trial.

trial court's findings, in the light most favorable to Defendant, the prevailing party below.

Based upon our review of the record, including the bail hearing transcript and the parties' submissions, we conclude that the trial court abused its discretion in modifying Defendant's bail to house arrest. Instantly, the trial judge acknowledged that "there are indications of [Defendant having] mental health issues [that she] would like to know more about" and also noted that she was not convinced about whether Defendant had become "de[]radicalzied" as it's "a complicated area [that involves] a lot of thought and research [and t]here are factors that can go in either direction." *See* N.T. Bail Hearing, 9/25/25, at 120-21. Notably, Agent Cunningham testified that, in order to deradicalize, an individual would not only need disengagement in the form of incarceration, but also need to voluntarily accept the fact that they need some form of therapy. *See* N.T. Bail Hearing, 9/29/25, at 60-61. *See also id.* at 73 (Agent Cunningham testifying, "You just can't disengage someone and expect de[]radicalization to happen without disengaging from the source of that violent extremism."). Instantly, there was no evidence that Defendant had voluntarily engaged in any therapy or any form of rehabilitation while incarcerated to indicate he was even attempting to deradicalize since his arrest in 2023.

While there is a constitutional right to bail, prisoners shall not receive bail when "no condition or combination of conditions other than imprisonment will reasonably assure the safety of any person and the community when the

- 23 -

proof is evident or presumption great[.]" Pa. Const. art. I, § 14. Moreover, under **Talley**, **supra**, even pre-trial, where a defendant has the presumption of the right to bail, a trial court may deny bail when, among other factors, the accused "presents a danger to any person and the community, which cannot be abated using any available bail conditions." **Id.** at 526. In order to properly analyze that factor, a court must undertake "a qualitative and quantitative assessment of the evidence adduced at the bail hearing." **Id.** at 522.

Assessing the Commonwealth's testimony from the bail hearing, and the fact that this modification occurred *post-verdict*, we conclude that the trial court's decision to place Defendant on house arrest is not supported by the law. Instantly, Commonwealth witnesses testified that: there was no evidence Defendant had seen a therapist or undergone any measures to deprogram or deradicalize in the 25 months he spent in prison awaiting trial; they had not seen any evidence to indicate that the "dangerousness of Defendant" was any different from when he had been arrested and charged back in August 2023; the staff at the electronic monitoring center does not have the ability to monitor individuals on house arrest using GPS technology or ensure that a defendant on house arrest does not have access to a cell phone; the electronic monitoring and field unit workers do not go to the house arrestee's residence "for anything," but only monitor the arrestee's bracelet and box, sending notices to a supervising officer. N.T. Bail Hearing, 9/29/25, at 89. Moreover, Pretrial Services Supervisor Lewin testified that once an

arrestee violates house arrest, it could take hours before authorities would begin searching for them. *Id.* at 84, 88.

While the trial judge may have believed that it was reasonable to place Defendant on house arrest under the circumstances,[22] practically the court's decision flies in the face of reality. Moreover, the trial judge effectively treats this case as though it were a pre-verdict modification of bail request instead of one made *after* a jury has returned a guilty verdict—when a defendant no longer has a state or federal constitutional right to bail. *McDermott*, *supra*. *See also supra* at n.15. Here, we have a case involving an individual, characterized by the trial judge as someone who has "an appetite for violent nature," that has been convicted of several felonies rooted in religious extremism and radicalization. The evidence presented by the Commonwealth supports the fact that Defendant will not be able to be appropriately monitored

_____

[22] Interestingly, what the trial judge deems the Defendant's "humor," the Commonwealth categorizes as a "callous attitude" best evidenced by the Defendant giggling as the court addressed him directly at the bail hearing. *See* N.T. Bail Hearing, 9/29/25, at 129 (trial judge addressing Defendant saying "I'm going to also be getting report of you, and I'm going to be watching you as closely—this is something that's not funny."). Additionally, the trial judge concluding that the fact Defendant did not "expound[] radical beliefs" in his more-than 800 pre-trial prison calls would support bail modification diametrically opposes the Commonwealth's view that Defendant exhibited a cavalier attitude about his actions borne out through the many phone conversations he had with his parents. Finally, the court's belief that Defendant was not a flight risk because he cooperated with law enforcement once he was caught by authorities in the instant matter and was a model prisoner with no prior record seems to cut against the fact that he has lost his presumption of innocence following the jury's guilty verdict.

on house arrest, no matter the conditions, in order to ensure the safety of the community.[23] *See* Pa.R.Crim. 521(D)(2) ("The judge shall also consider whether there is an increased likelihood of the defendant's fleeing the jurisdiction or whether the defendant is a danger to any other person or to the community or to himself or herself."); *see also Talley*, *supra*, at 525-26 (court may deny bail when "Commonwealth's proffered evidence makes it substantially more likely than not that the accused . . . presents a danger to the community that cannot be abated using any available bail conditions); *Commonwealth v. Cabeza*, 413 A.2d 1054, 1056 (Pa.1980) (person seeking release on bail pending sentence "countervailing public need to insure that the defendant will remain in custody increases greatly").[24]

Although the trial court attempted to impose "strict" conditions on Defendant's house arrest, the Commonwealth's "proof is evident" that "no condition or combination of conditions other than imprisonment [of Defendant] will reasonably assure the safety of any person and the community[.]" PA. CONST. art I, § 14. Likewise, the Commonwealth's

---

[23] Notably, a Commonwealth witness testified that if Defendant were released from incarceration pending sentencing, members of the LGBTQ community would be in fear, the ripple effect of which would extend to family and friends.

[24] Moreover, the fact that the trial judge, herself, acknowledges that the court needs more information about Defendant's mental health issues and expert evaluations on whether Defendant "poses a future threat," implicitly shows the serious and dangerous nature of the matter. The fact that **no one** presented any evidence that at the present time Defendant does **not** pose a danger or a "future threat", makes the judge's decision an abuse of discretion.

evidence "tends to show that th[e house arrest] conditions [set by the trial judge] would be inadequate to ensure the protection of any person or the community." **Talley**, **supra** at 525. Accordingly, in light of the foregoing, and pursuant to **N.E.M.**'s mandate to consider petitions for specialized review on their merits, we reverse the trial court's September 29, 2025 order granting bail modification in the form of house arrest and remand for the reimposition of Defendant's original bail. **See** Pa.R.Crim.P. 521(A)(2)(b).

Order reversed. Case remanded with instructions. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/14/2025